## Case No. 16,553.

UNITED STATES v. TWELVE CASKS OF CUDBEAR.

[Gilp. 507.] [1]

District Court, E. D. Pennsylvania. Dec. 8, 1834.

CUSTOMS DUTIES—VALUATION—GOODS PURCHASED AND GOODS MANUFACTURED BY EXPORTER.

1. Where goods, subject to ad valorem duty, are purchased in a foreign place and exported to the United States, a true valuation in the invoice is the actual cost at which they were purchased.

2. Where goods, subject to ad valorem duty, are manufactured in a foreign country, and exported to the United States by the manufacturer, a true valuation in the invoice is the market price or value at the place of exportation.

The information filed in this case by the district attorney, charged that on the 18th

---

[1] [Reported by Henry D. Gilpin, Esq.]

July, 1831, certain goods, wares, and merchandise, to wit, twelve casks of cudbear, were imported into the port of Philadelphia, from a foreign place, to wit, Bristol, in England, on board of the brig Achilles, of which Thomas Cox was master, and were entered at the custom house on the 30th July; that these goods were then and there subject to ad valorem duty; and that the invoice thereof was made up with intent, by a false valuation, to evade and defraud the revenue. The law alleged to be violated was the fourth section of the act of May 28, 1830 [4 Stat. 410], which provides, "that the collectors of the customs shall cause at least one package out of every invoice, and one package at least out of every twenty packages of each invoice, and a greater number, should they deem it necessary, of goods imported into the respective districts, which package or packages they shall have first designated on the invoice, to be opened and examined; and if the same be found not to correspond with the invoice, or to be falsely charged in such invoice, the collector shall order forthwith all the goods contained in the same entry to be inspected; and if such goods be subject to ad valorem duty, the same shall be appraised; and if any package shall be found to contain any article not described in the invoice, or if such package or invoice be made up with intent, by a false valuation, or extension, or otherwise, to evade or defraud the revenue, the same shall be forfeited." On this information, the cudbear being seized and publication made, Philip Bennett, of Philadelphia, appeared and claimed the goods in question, as the sole owner and importer; and, at the same time, denied the allegation that the invoice was made up with intent, by a false valuation, to evade and defraud the revenue.

It did not appear, by the pleadings or otherwise, that the seizure was made on land, and the case was heard by the district judge on the 8th December, 1834, when the following facts and circumstances were proved. On the 18th July, 1831, the brig Achilles arrived at Philadelphia, with the twelve casks of cudbear on board. On the 30th of the same month, Philip Bennett went to the custom house and entered them as the owner and importer thereof; taking at the time the oath prescribed in the fourth section of the act of 1st March, 1823 [3 Stat. 730], to be taken by the owner, "in cases where goods, wares, or merchandise, have been actually purchased;" and declaring that the invoice produced, contained a just and faithful account of the actual cost of them, including all charges. The invoice was as follows: "Bristol, May 7th, 1831. Mr. Philip Bennett bought of Lediard Jones and Mortimer, twelve casks of cudbear, nett 42.0.24, or 4728lb, at 6d. £118.4.0. Lediard Jones and Mortimer. Per Achilles, T. Cox, for Philadelphia."

After an examination of one cask, it was

deemed necessary, by the collector, that the whole should be examined, which was done on the 2d August, by the United States' appraisers. They carefully inspected the cudbear, and compared the price with that usually paid for what was of similar quality. The result was a report that there was an undervaluation in the invoice, and that the fair market value of the article imported was, at least, eight and a half pence per pound. Mr. Bennett considered this appraisement too high, and according to the provisions of the third section of the act of 28th May, 1830 [4 Stat. 409], two merchants, Messrs. Lowber and Davis, were, with his assent, appointed by the collector, to make a re-appraisement. The result was an increase in the valuation of the cudbear to ten pence per pound. No other evidence of the purchase was offered except the invoice above mentioned. On the 12th August, the cudbear was seized by the collector, on the ground stated in the information. In the month of October following, Mr. Bennett presented to the collector another invoice, being a copy of that exhibited at the time of entry, but now accompanied by a consular certificate, prepared according to the provisions of the eighth section of the act of 1st March, 1823, in cases where the goods are owned by a person not residing in the United States. In this certificate Philip Jones makes oath, before the American consul, at Bristol, that the cudbear in question was consigned by the house of Lediard Jones and Mortimer, of which he was a member, to Philip Bennett; that it was actually manufactured for their own account; and that the annexed invoice contained a true and faithful account of its actual value.

On the hearing, testimony, taken under a commission to England, was given on the part of the claimant, to show that he was the bonâ fide purchaser and actual owner of the cudbear at the time of importation, and not the mere consignee. Much evidence was also produced to prove that it was an article of inferior quality to that usually imported, and from which the appraisers formed their estimate of value.

Mr. Gilpin, U. S. Dist. Atty.
Mr. Broom, for claimant.

HOPKINSON, District Judge. The information claims a forfeiture of the goods described in it, on the ground that the invoice, by which they were entered at the custom house, was made up, with intent, by a false valuation, to evade and defraud the revenue.

The material question, then, is, what is a false valuation, in the meaning of the revenue laws? We come at this by inquiring, what is a true valuation under those laws? Two tests of true value are given by the law: (1) In the case of a purchase of goods in a foreign place, exported to the United States, the true value, at which they must be invoiced and entered, is the actual cost and price at which they were sold and purchased. (2) In case of goods sent to this country by the manufacturer on his own account, the true value, at which they must be invoiced and entered, is the market price or value at the place of exportation.

The claimant alleges that the goods were purchased by him, in England, of the manufacturers, Messrs. Lediard Jones and Mortimer, and that his invoice truly states the price at which they were purchased. If this be true, he fully answers the information and acquits himself of the forfeiture. What is his proof to support this claim? (1) The invoice produced at the custom house for the entry, and sworn to by him. This instrument or invoice is, in form, a bill of sale; a bill of parcels. It is headed, "Bristol, 7th May, 1831, Philip Bennett bought of Lediard Jones and Mortimer." The weights of the twelve casks are then particularly given. The whole is charged at six pence per pound, and carried out at one hundred and eighteen pounds four shillings; and, at that price, the entry is made. (2) The testimony taken under the commission to England, by which two witnesses were examined; one of them, Philip Jones, of the above firm; the other, James Parsons, an accountant in Bristol, and employed by the said firm. The former witness, Philip Jones, swears directly and distinctly to the sale of the cudbear in May, 1831, to the claimant, and that the price charged in the invoice "was the actual price and cost of said cudbear, paid or contracted to be paid by the said Bennett to our firm therefor." Parsons says that he believes the said firm did sell to Bennett the cudbear mentioned, and ship it to him at Philadelphia. These depositions are accompanied and corroborated by an authenticated copy of the account current, between the said firm and the claimant, in which this cudbear is charged to him on the day of the invoice in the regular course of the account, preceded and followed by many articles or charges in due order and apparent fairness. The cudbear is charged in the account at the same price at which it was invoiced and entered at the custom house.

If these depositions and documents may be relied upon, the claimant has made out his two points of defence; that is, that these goods were purchased by him in England, and that he has invoiced and entered them at the actual price and cost he paid for them. Let us suppose that this is not the truth of the case; but that the goods were actually the property of Lediard Jones and Mortimer, and exported by them to this country, consigned to the claimant, and to be disposed of here on their account. How will the forfeiture then stand? The question still is, were they entered by an invoice made up to defraud the revenue by a false valuation. We

must, in this view of the case, put aside the testimony of Mr. Jones, he being one of the firm to whom the goods belong. There being no actual sale of the cudbear, we cannot have the price, at which it was sold, as our test of a true or false valuation. We must resort to the other test; to wit, the market price or value at the place of exportation. What case has the claimant on the evidence in this view?

The evidence of Mr. Parsons. He swears, that he believes the cudbear alluded to, was invoiced at sixpence a pound, "which was its fair value in the English market." That there are usually three qualities made, which differ from fourpence to three farthings a pound; that the cudbear shipped to the claimant to Philadelphia was of the worst quality; that in March, 1831, the claimant bought of Lediard Jones and Mortimer twenty-four casks of cudbear, which were shipped to New York by the Coriolanus in April, 1831, and six casks shipped by the Protector, of the same quality and price with that shipped to Philadelphia. It appears, by a certificate from the deputy collector at New York, that the twenty-four casks mentioned by Parsons arrived there in the Coriolanus, and were then admitted to an entry at the price or value mentioned, that is, sixpence a pound; and in the account current alluded to they were so charged to the claimant. How are these proofs of the market price or value of the cudbear affected by the testimony taken here? It seems to be an article little known here now, and which was still less so at the time of the arrival of this importation; at least, the great difference in the quality and price was not then well understood. The better qualities only seem then to have been brought here, and it was by the prices of those better qualities, and a comparison made between them and this, that the value was fixed upon this by the appraisements of the custom house officers, and the other appraisers subsequently appointed by the collector. The first appraisers put the cudbear at eight pence halfpenny per pound, making the whole invoice worth one hundred and sixty-seven pounds nine shillings. The second appraisers went still higher, valuing it at ten pence per pound, the whole at one hundred and ninety-seven pounds. We have had both sets of appraisers here under examination. They made their estimate, as Mr. Ross says, under information which they took pains to obtain, that the "article was of a fair quality." Other evidence, we have had in this cause, affords good reason to believe that this information was not correct, and of course, that the estimate made upon it ought not to be our rule of value. Mr. Lowber, one of the appraisers appointed by the collector, testifies, that at the time he valued this cudbear at ten pence a pound he believed it to be its true value; he formed his judgment upon what he had paid for the article when imported by himself.

His came from London, and he paid one shilling and threepence for some, and one shilling and sixpence for other parcels. His cudbear was made from moss of the Canary Islands, which is considered the most valuable. It was by a comparison with such an article that he valued the importation of the claimant. He adds, that he always imported the first quality, considering the inferior to be of little value. Since he made the appraisement he has ascertained from the manufacturers, who use it, that the inferior quality is not worth buying. With his present knowledge of the article, he would not buy that in question at any price, to sell out of his store. He does not think it has the value he appraised it at. We must remember that Mr. Parsons swears, expressly, that the cudbear shipped to the claimant was of the inferior quality. The testimony of Mr. Bullock seems to be decisive of the value of this article, at least in the Philadelphia market. He is well acquainted with it; is in the habit of buying and selling it; has a great deal of business with the manufacturers who use it; and has examined this cudbear. It is of very inferior quality; the worst he has ever seen. He has a part of that imported by the claimant into New York now on hand. It was sold by auction in New York for eight cents; part of it was sold in the same way in this city, for the same price. He has frequently offered it for sale at that price, but the manufacturers will not touch it. He has seen an invoice from the same house at Bristol, to another person, in which cudbear was charged at the same price, six pence per pound.

Upon this evidence, it is impossible to say, that the invoice of the cudbear in question was made up, by a false valuation, to defraud the revenue, even if we shall consider it to be a consignment made by the manufacturers on their own account, and, of course, to have the truth of the invoice tested by the price or value of the goods at the place of exportation. If, on the other hand, we shall consider it as the property of the claimant, purchased by him of the manufacturers, the testimony is uncontradicted and satisfactory to prove that the price or value stated in the invoice, is precisely that which it cost him in England. No wrong, however, is imputable to the officers of the customs. They obtained the best information on the subject within their reach, and acted on it in good faith.

Decree. That the information be dismissed, and the goods restored to the claimant.